9 F.3d 107
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
David J. DYKHOUSE, Commissioner of Insurance, as
Receiver/Liquidator for Cadillac Insurance Company
in Liquidation, Plaintiff-Appellee,
v.
Martin HOFFMAN, Defendant-Appellant.
 No. 92-2184.
 United States Court of Appeals, Sixth Circuit.
 Oct. 19, 1993.
 
 Before: KEITH, GUY, and BATCHELDER, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant, Martin Hoffman, appeals the grant of summary judgment in favor of the plaintiff in this diversity action. Defendant argues that there was no evidence of a breach of fiduciary duty to render him personally liable; that the district court failed to consider his affirmative defense of set-off; and that the damages awarded were not supported, were in dispute and not amenable to resolution on a motion for summary judgment. We affirm the district court's decision concerning liability, but remand for further proceedings as to the appropriate amount of damages.
 
 I.
 
 2
 Plaintiff is the successor in interest of Cadillac Insurance Company, a Michigan insurance company which was placed into liquidation by order of the state receivership court in January 1990. Prior to liquidation, Cadillac's primary source of revenue was from the sale of automobile insurance policies in the State of Michigan. It also sold policies insuring other commercial risks in other states. Cadillac was a wholly owned subsidiary of Arlans Insurance Agency, Inc. Defendant Corporate Risk Management (CRM) is a corporation established under the laws of New York with defendant Martin Hoffman as president and sole shareholder.
 
 
 3
 In April 1988, Cadillac signed an agreement with CRM which appointed CRM its managing agent, authorizing CRM to act as Cadillac's representative in the sale, acceptance, and servicing of Cadillac insurance policies sold by CRM. Pursuant to the terms of the agreement, CRM was required to deposit all premium funds received into a premium trust account. Under the agreement, CRM received a commission of seven and one-half percent of "net written premiums," defined in the agreement as original premiums and endorsements less cancellations, for Cadillac insurance policies sold by CRM. CRM adjusted claims and paid out losses using the portion of the premiums belonging to Cadillac that CRM held in trust. An accounting was to be completed at the end of each month and the remaining premiums were to be remitted to CRM.
 
 
 4
 In December 1988, Cadillac and CRM altered the terms of their agreement. This new agreement was memorialized in what the parties refer to as the "1989 Retro Agreement," because it was signed in May 1989 but was made retroactively effective as of April 1988. Under the 1989 Retro Agreement, as before, CRM held all premiums received in trust for Cadillac.[1] Cadillac was to advance CRM, monthly, 90 percent of the premiums as a "provisional commission." CRM continued to adjust and pay claims, however, unlike the earlier agreement, the expenses and claims were paid out of CRM's 90 percent provisional commission. If the premiums collected exceeded losses paid out, then CRM made a profit. Conversely, if the premiums collected did not exceed the losses paid out, then CRM suffered a loss. Hence, the adjective "provisional" before the word "commission." In addition to paying Cadillac ten percent of the premiums collected, CRM was required to pay a monthly five percent provisional administrative fee. Annually Cadillac was to provide an accounting of actual adminsitrative expenses and, if this amount was less than the five percent received, Cadillac was to refund the difference.
 
 
 5
 In the insurance industry the 1989 Retro Agreement is commonly referred to as a "fronting arrangement." Effectively, CRM rented Cadillac for ten percent of the premiums collected plus administrative fees. However, under law, Cadillac remained liable for all claims made on the CRM-produced policies. In addition, under the 1989 Retro Agreement, CRM agreed to hold Cadillac harmless and to indemnify Cadillac from and against any and all claims. Under both contracts, CRM was supposed to secure reinsurance for all policies it sold. The reinsurance that CRM purchased was through an unauthorized company that subsequently went bankrupt.
 
 
 6
 In addition to adjusting and paying claims on policies produced by CRM, CRM also paid losses on Cadillac policies produced by United Diversified Corporation (UDC). UDC had been Cadillac's managing agent prior to CRM but had become insolvent several years earlier. The arrangement with CRM to adjust and pay claims on UDC produced Cadillac policies was not embodied in any written contract but was allegedly at the specific request of Soloman, the sole shareholder of Cadillac's parent company, Arlans Insurance Agency, Inc. Soloman had also been the principal stockholder of UDC.
 
 
 7
 Three months after the 1989 Retro Agreement was signed, Cadillac was placed into conservatorship by a receivership court decision. At this time, CRM began to delay making payments on claims made under CRM produced policies. Eventually CRM stopped paying claims altogether. Cadillac's attempts to have CRM either pay the claims or return the collected premiums were without success. Cadillac then instituted the current action against defendants in October 1989 in Michigan state court. In January 1990 Cadillac, was placed into receivership and in April 1990 defendants were notified that Cadillac was in bankruptcy.
 
 
 8
 Over the course of the proceedings below, the case was removed to federal court; three different amended complaints were filed; and defendants responded to each with answers, affirmative defenses, and counterclaims. After the second amended complaint had been filed, plaintiff moved to dismiss defendants' counterclaims. The district court granted this motion and an interlocutory appeal was heard by this court. This court agreed with the dismissal, but reversed and remanded the case with instructions to the district court to abstain, under Burford v. Sun Oil Co., 319 U.S. 315 (1943), from adjudicating CRM's counterclaims and to remand the counterclaims to the receivership court. (App. 731-32.)
 
 
 9
 After remanding, the plaintiffs filed their third and final amended complaint. Count I of the third amended complaint sought a declaratory judgment against CRM invalidating the 1989 Retro Agreement. Count IV alleged a breach of fiduciary duty by Hoffman. The district court granted plaintiff's motion for partial summary judgment on Count I, finding that the 1989 Retro Agreement was a violation of Michigan law and therefore was invalid. Plaintiff also moved for partial summary judgment on Count IV. After a hearing on the motion, the district court granted plaintiff's motion finding that Hoffman had breached his fiduciary duty and was personally liable.
 
 
 10
 The district court then requested the parties submit an accounting of damages as calculated under the 1989 Retro Agreement. The court required that damages be calculated under the 1989 Retro Agreement because, while the court had found that agreement invalid, it found that Hoffman could not be held liable for damages under the 1988 Agreement, stating "the parties operated under the Retro Agreement rather than the 1988 Managing Agency Agreement." (App. 734.) Gross written premiums on CRM produced Cadillac policies totalled almost $15 million. CRM had paid Cadillac approximately $1.5 million and had paid claims of just over $2.2 million. Hoffman, now proceeding pro se, submitted his calculations that showed Cadillac owed CRM money, while plaintiff submitted damage calculations alleging that Hoffman owed plaintiff over $6.3 million. The district court awarded plaintiff damages in the amount of $6,162,757.
 
 II.
 
 11
 We review de novo a district court's grant of summary judgment. EEOC v. University of Detroit, 904 F.2d 331, 334 (6th Cir.1990). Summary judgment is appropriate "[w]here the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial...." Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir.1987). Although we must draw all justifiable inferences in favor of the non-moving party, Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), there must be a disagreement regarding a material fact. Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir.1986).
 
 
 12
 Hoffman first argues that the district court failed to consider his affirmative defense of set-off. Defendant argues that any amount he owes to the plaintiff should be offset by amounts that Cadillac, now the receiver, owes to defendant. This consists largely of the amounts that were paid by CRM on UDC produced policies. The district court determined that "any offsets defendants can claim are part of their counterclaims, which this court remanded to the state court at the direction of the United States Court of Appeals for the Sixth Circuit." (App. 856.) Although Hoffman labels these amounts "offsets," this does not entitle him to litigate what are, in effect, counterclaims. That issue has already been addressed by this court and is now the law of the case. See Coal Resources, Inc. v. Gulf & Western Indus., 865 F.2d 761 (6th Cir.1989); In re Oil Spill by the Amoco Cadiz, 954 F.2d 1279, 1291 (7th Cir.1992) ("It is well established that a decision of an interlocutory appeal may be the law of the case."). Inasmuch as there are expenses claimed that were part and parcel of the 1989 Retro Agreement, those amounts appropriately might be calculated into the damages. However, given our resolution of the damages issue (see infra section IV), the district court will have an opportunity to make findings regarding any expenses under the 1989 Retro Agreement that may be credited to CRM and Hoffman.
 
 
 13
 Hoffman next argues that there was no evidence to support a finding of a breach of fiduciary duty. Hoffman argues that because the district court found that the 1989 Retro Agreement was the agreement under which the parties were operating and because it is not disputed that Cadillac was paid ten percent of the premiums collected, there can be no finding of a breach of fiduciary duty. Count IV of the third amended complaint alleged that Hoffman breached his fiduciary duty under Mich.Comp.Laws.Ann. Sec. 500.1207(1), which provides:
 
 
 14
 An agent shall be a fiduciary for all money received or held by the agent in his or her capacity as an agent. Failure by an agent in a timely manner to turn over the money which he or she holds in a fiduciary capacity to the person to whom they are owed is prima facia evidence of violation of the agent's fiduciary responsibility.
 
 
 15
 Hoffman's position is that under the facts of this case the statute does not support liability because Cadillac received ten percent of the premiums; therefore, no premiums were withheld from the liquidated insurer. Hoffman fails to recognize that under the 1989 Retro Agreement, all premiums were held in trust for Cadillac and it was only after losses and claims were paid, and expenses were deducted, that CRM received its actual commission. CRM's failure to adjust and pay claims on CRM produced policies was a failure to turn over money that was held in a fiduciary capacity to the person to whom it was owed, i.e., the policyholder claimants. That was a breach of fiduciary duty under the statute, not just a breach of contract as Hoffman argues. Under the 1989 Retro Agreement, while Cadillac did receive its ten percent fee, Cadillac relied on Hoffman to hold the remaining 90 percent of the premiums in trust for the payment of claims. When CRM stopped paying claims, various guaranty associations[2] made payments to claimants totalling over $5.5 million. After the guaranty associations pay such claims, the associations become creditors in the receivership.
 
 
 16
 Under Michigan law, corporate officers are personally liable for the torts they commit on behalf of a corporation. Warren Tool Co. v. Stephenson, 11 Mich.App. 274, 300-301 (1968). Furthermore, "a corporate officer is personally liable for the tortious injury committed by him regardless of a piercing of the corporate veil." In re Interstate Agency, Inc., 760 F.2d 121, 125 (6th Cir.1985). In this case we find In re Interstate controlling. In Interstate, this court determined that the president, large shareholder, and personal signatory to the insurance agency contracts at issue was personally liable for premiums funds wrongfully withheld. Id. at 125. Hoffman was president and sole shareholder of CRM, he personally signed the agreements with Cadillac, and the evidence is undisputed that CRM acted only by and through Hoffman's direction. The district court's decision, finding Hoffman personally liable for the breach of the fiduciary duty in retaining premiums held in trust, is affirmed.
 
 III.
 
 17
 After the district court found Hoffman personally liable, it ordered: "The parties shall examine the figures and attempt to determine the amount due. If the parties cannot agree on the amount, they each shall submit to the court by July 2, 1992, their calculations of the amount they believe Mr. Hoffman owes...." (App. 734-35.) The parties agree that gross written premiums equalled $14,864,207, and that Hoffman owes plaintiff a ten percent fronting fee of $1,486,420. Plaintiff also claimed that Hoffman owed a five percent administrative fee, equalling $743,210. Hoffman argues that under the language of the contract, Cadillac was not to receive a flat five percent fee but was to receive its actual administrative fees, not to exceed five percent. Because plaintiff has offered no proof as to what the actual costs were, Hoffman argues that there should be no award for an administrative fee.
 
 
 18
 The parties do not dispute that CRM paid some money to Cadillac during the course of the relationship. Plaintiff states that CRM paid $1,392,872, while defendant maintains CRM paid $1,567,267. The difference of $174,395 represents the amount that CRM paid to Independence Insurance Company for reinsurance. That reinsurance contract was declared void and the premium was refunded by Independence directly to Cadillac. The district court credited Hoffman with this amount.
 
 
 19
 Hoffman ended his calculations here, concluding that plaintiff owed him $80,846 ($1,486,420 - $1,567,267 = ($80,846)) (App. 849). Plaintiff alleged that there was an additional $5,500,394 owed, representing the losses from claims on policies which defendants retained the premiums but refused to pay the claims. The district court concluded that Hoffman was liable for damages in the amount of $6,162,757.[3]
 
 
 20
 Hoffman first argues that the district court erred in awarding the $5.5 million as part of the damages because it had not been specifically pled. Plaintiff points to paragraph 52 of the third amended complaint, which states:
 
 
 21
 In violation of CRM's and Hoffman's fiduciary duties owed to [Cadillac], CRM and/or Hoffman have failed to remit to [Cadillac] insurance premium proceeds received on behalf of [Cadillac] in a timely manner or within the time periods prescribed either in the Retro or the 1988 Agreement.
 
 
 22
 (App. 155.) While this paragraph might not be all that clear, Count IV expressly incorporated all of the allegations preceding Count IV, including damages for payments of "all claims made by or on behalf of any state's guaranty fund." (App. 154.) Count IV also requested that Hoffman be ordered to remit "all insurance premium proceeds rightfully belonging to [Cadillac]" and that the district court grant "such further and additional relief as this Court deems appropriate." (App. 156.) We believe that the allegations in the complaint as a whole put defendant on notice that part of the damages sought included claims on CRM produced policies that CRM refused to pay and that were paid instead by the various state guaranty agencies. Additionally, Federal Rule of Civil Procedure 54(c) states that "[e]xcept as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." Therefore we reject Hoffman's argument that the amount paid by the various state guaranty agencies cannot be part of the judgment because it was not specifically pled.
 
 
 23
 Defendant next argues that the $5.5 million in claims were never established as actually incurred or paid by the plaintiff, and that some of the amounts paid by the guaranty associations were on policies not covered by either the 1988 Agreement or 1989 Retro Agreement. Once the guaranty associations pay claims on behalf of a liquidated insurance company, the associations become creditors of the liquidated companies. In an affidavit submitted with plaintiff's calculation of damages, Jacqueline Reese, deputy receiver of Cadillac, stated that "state guaranty associations ... have paid a total of $5,500,394 on claims made against CRM-produced Cadillac insurance policies." (App. 819.) Reese also explained that, at that time, the various guaranty associations had $1,528,963 in loss reserves for claims made on CRM-produced Cadillac policies. Loss reserves are estimates of losses on claims that have been made but not settled. Plaintiff stated that it was not seeking this latter amount in damages because it wished to terminate the litigation. The numbers stated by Reese were based on compilations of reports from the various states. Plaintiff's motion stated that the record was not attached because it was too voluminous but that, if necessary, plaintiff would make the records available for the court's review, and that the record had been forwarded to Hoffman with plaintiff's brief.
 
 
 24
 Hoffman argues that the deputy receiver's affidavit was not based on personal knowledge. We find that Reese's affidavit complies with Federal Rule of Civil Procedure 56(e), in that it is based upon her personal familiarity with the case and her review of the files. See Vote v. United States, 753 F.Supp. 866 (D.Nev.1990). This, of course, resolves only the issue of its admissibility. Whether its content is accurate is another question.
 
 
 25
 Hoffman next argues that there was a dispute as to the amount of damages. After the court granted plaintiff's motion for partial summary judgment, finding that a breach of fiduciary duty occurred and that Hoffman was personally liable, the court order that the parties submit briefs on damages by July 2, 1992. Hoffman, at this point proceeding pro se, submitted his brief on July 8, 1992. Plaintiff submitted its brief on July 9, 1992. After judgment was rendered, Hoffman submitted an affidavit stating that after receiving the plaintiff's calculation of damages, he called the court and spoke with the judge's law clerk requesting to "submit a supplementary brief responding to Plaintiff's new claims for damages." (App. 889.) Hoffman states that the law clerk told him "that the Court did not want anything further from me." (App. 889.) His affidavit further states that the five percent administrative fee was not appropriately awarded because under the contract Cadillac was only entitled to payment for actual administrative expenses and there had been no proof of actual expenses. Hoffman averred that his review of the records forwarded to him, which he described as "supporting documentation" but not the actual files, showed that included in the $5.5 million were "many claims on policies not produced by CRM, and for excessive payments in the area of loss adjustment expenses, which are not attributable to the CRM or me." (App. 890.) Hoffman attached his own summary of the payments that were included in the $5.5 million but were actually payments on UDC policies, or for other reasons were not covered by the 1989 Retro Agreement. These disputed payments total over $2 million.
 
 
 26
 It must be remembered that this case was decided on motion for summary judgment. Based on what had been presented to the district court, the plaintiff's claims for approximately $5.5 million and the five percent fee were deemed undisputed, but this was due to Hoffman's perceived inability to submit additional evidence to rebut plaintiff's assertions. The district court made no provisions for either party to respond to the other's brief on damages because the briefs were essentially submitted simultaneously. Hoffman did not have access to the actual file on which the plaintiff's calculations were based and did not receive the supporting documentation until after he had already filed his brief on damages. The failure to allow him to respond to these figures requires that we remand this case for further proceedings. There exists a significant dispute on a material fact--the amount owed. Based on what the parties have presented in their briefs before this court and on the record, which still does not include copies of the actual files but only summaries prepared by each party, this case must be remanded for a factual determination as to the appropriate amount of damages.
 
 
 27
 The judgment as to liability is AFFIRMED. The judgment as to the amount of damages is REVERSED and REMANDED to the district court for trial on the issue of damages.
 
 
 
 [1]
 The contract provided:
 All premiums received by CRM on behalf of and due to CADILLAC shall be held by CRM as Trustee for CADILLAC and shall be deposited by CRM in a Premium Trust Account in the name of CADILLAC. Funds deposited in the Premium Trust Account shall be remitted to CADILLAC within forty-five (45) days after the close of the accounting month less losses and LAE paid pursuant to Article VIII, commissions paid pursuant to Article X plus recoveries.
 (App. 96.)
 
 
 [2]
 Guaranty associations are established within each state to cover the claims of policyholders of insolvent insurance companies
 
 
 [3]
 The district court calculated damages as follows:
 
 
 [10]
 percent fronting fee $1,486,420
5 percent administrative fee 743,210
losses paid on claims 5,500,394
amounts already paid (1,567,267)
------------------------------------------
TOTAL $6,162,757
 (App. 850.)